# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

RICHARD KEYSER,                    *

    Plaintiff,                    *

v.                                 *          Civ. No. DLB-23-3030

NURSE KING, *et al.*,              *

    Defendants.                   *

## MEMORANDUM OPINION

Self-represented plaintiff Richard Keyser filed suit for damages and injunctive relief pursuant to 42 U.S.C. § 1983 against Correctional Officer II Vernon Wroten, Lieutenant Bryant Torney, Major Eric Kiser, Warden William Bradley, Sergeant Richard Stigall, Lieutenant Jeffrey Kestler, Dr. Paul Matera, M.D., Dawud King, RN, and Sara Johnson, RN.[1] Keyser alleges that, on October 20, 2023, he was assaulted by another inmate while housed at Eastern Correctional Institution ("ECI") and suffered serious injuries. He claims that the defendants failed to protect him from the assault and failed to provide him with adequate medical care after the assault.

The Warden, Wroten, Torney, Kiser, Stigall, and Kestler ("correctional defendants") and Dr. Matera, King and Johnson ("medical defendants") filed motions to dismiss or, in the alternative, for summary judgment. No hearing on the motions is necessary. *See* Loc. R. 105.6 (D.

---

[1] The Clerk shall amend the docket to reflect the full and correct names of the defendants.

Md. 2025). For the reasons stated below, the defendants' dispositive motions, treated in part as motions to dismiss and in part as motions for summary judgment, are granted.

## I.     Background

The following facts are from Keyser's complaint and the record. On September 30, 2023, Keyser, while confined at ECI, was placed on administrative segregation and assigned to cell 48 in Housing Unit ("HU") 4, where another inmate, Antonio Epps, was already assigned. ECF 36-3, at 1, ¶ 3; *id.* at 6. On October 16, 2023, Keyser was released from administrative segregation and assigned to HU 3-general population. *Id.* at 6, 11. When Keyser was brought to his cell, he refused to enter the cell because his cellmate, a member of the Bloods gang, previously had attempted to stab him. ECF 13, at 10. Because he refused housing, Keyser was returned to administrative segregation and cell 48 where Epps was still assigned. ECF 36-3, at 6, 11; ECF 13, at 10.

Keyser alleges that on October 20, 2023, while he was back in administrative segregation, Epps attacked Keyser in their cell, inflicting stab wounds and head injuries and causing Keyser to go blind in his right eye. ECF 13, at 8. Keyser states that Epps, a member of prison gang Murder Inc., was assigned to segregation for fighting with security staff. *Id.* at 10. Keyser believes that Epps got himself assigned to segregation as "a ruse to get near Keyser" and retaliate "for an earlier incident." *Id.* Keyser speculates that Epps may have been paid by the Bloods to attack him. *Id.* Keyser states that the Warden and unidentified staff in Unit 4 "had a duty to house [him] apart from other prisoners for his safety, which duty they breached contributing to the unprovoked assault by Epps." *Id.*

Keyser also asserts that Wroten, a correctional officer, was required by Department of Public Safety and Correctional Services ("DPSCS") policy to make rounds every 30 minutes but failed to make them from 11:00 p.m. until after 2:00 a.m. on the night Keyser was assaulted. *Id.* at

8–9. Keyser claims that Wroten's failure to make the required rounds amounted to a failure to protect him from the assault. *Id*. at 9.

The record shows that, on the night of October 19, 2023 and early the next morning, security rounds were conducted "approximately every thirty minutes." ECF 36-3, at 2; *see also id.* at 3 (noting status of unit at 11:00 p.m. and 11:35 p.m. on October 19 and at 12:03 a.m., 12:30 a.m., 12:55 a.m., 1:10 a.m., 1:34 a.m., and 2:30 a.m. on October 20). On October 20, during shower escorts, Keyser advised Wroten that he had been involved in an altercation with Epps the night before and did not want to return to his cell. *Id.* at 7. Wroten informed the Officer in Charge, and Keyser was taken to the medical unit. *Id*.; *see also* ECF 13, at 8. Keyser alleges that he was seen by Nurse King, who provided him only Tylenol, failed to examine his eye or bandage his wounds, and failed to follow up regarding his injuries. ECF 13, at 8–9. Keyser also claims that, on the same day the prison staff discovered his injuries, Shift Supervisor Torney and Shift Commander Kiser failed to ensure he received medical care for his injuries. *Id*. at 8.

The record indicates that, on October 20, 2023, "[m]edical staff confirmed that [Keyser] had slight injuries consistent with an apparent altercation but could not determine when" the altercation occurred. ECF 36-3, at 7. The record does not indicate who from the medical staff confirmed Keyser's injuries. Nurse King swears there are no medical records showing that he saw Keyser on October 20, 2023, and King does not remember the event. ECF 25-7, at 2, ¶ 5. Nurse King explains that under the standard procedure, a "Matter of Record" is completed when an inmate is injured, and the medical unit must evaluate the inmate. *Id*. ¶ 6. According to King, there is no Matter of Record documenting that Keyser was assaulted on either October 19 or 20, 2023. *Id*. King further explains that if he had seen Keyser was bleeding, he would have treated him, and

custody staff would have taken pictures of the injuries. *Id*. Further, if Keyser had told King that he was unable to see, King would have notified the on-call physician. *Id*.

The record shows that Keyser submitted a sick call slip on October 26, 2023, stating that he was assaulted by another inmate on October 19, 2023, was experiencing pain, and could barely eat due to the pain in his mouth. ECF 25-5, at 13. He also reported he had a headache and a blood clot in his right eye. *Id*. Nurse King triaged the sick call slip on October 30, 2023, and another nurse responded to the sick call on November 3, 2023, noting there was no documentation of an assault and that Keyser's medical appointment had been rescheduled twice in the two preceding days due to staffing limitations. ECF 25-2, at 2–3, ¶ 5; ECF 25-5, at 13. According to the response to Keyser's sick call, Tylenol was ordered, Keyser had glaucoma in his right eye, and he had been seen by an optometrist on March 16, 2023. ECF 25-2, at 2–3, ¶ 5. At the time of the optometry consult, Keyser's visual acuity was 20/200 in the right eye, 20/200 in the left eye, and 20/200 in both eyes. *Id*.

On November 3, 2023, RN Adrion evaluated Keyer in response to his October 26 sick call request. ECF 25-4, at 12. Keyser reported being assaulted by another inmate on October 19, 2023 and reported difficulty eating due to pain in his mouth, a headache, and a blood clot in his right eye. *Id*. He stated that his pain level was 9/10, sometimes 10/10, and that Motrin and aspirin helped a little. *Id*. at 13. He also reported trauma and severe pain in the right eye, chronic left eye blindness, and blurry vision in both eyes. *Id*. Keyser kept his eyes closed and resisted opening them except for an eye examination. *Id*. During the eye exam, Keyser was unable to read the Snellen chart. *Id*. He complained of a headache on the right side of his head and pain in his jaw when chewing. *Id.* at 14. However, he also reported eating food that morning and denied a decrease in food intake. *Id.* at 14, 15. He was oriented and able to move all limbs and exhibited normal grip

strength and arm resistance. *Id*. at 14. His face and smile were symmetrical. *Id.* He exhibited tenderness along the temple. *Id*. The nurse referred Keyser to a provider and advised him to contact medical if new symptoms developed or his current symptoms worsened. *Id*. at 15. He was prescribed Tylenol. *Id.*

Keyser alleges that he did not receive adequate treatment for his injuries until November 8, 2023, when his new cellmate contacted Keyser's mother, who contacted prison staff, who then transported Keyser to a hospital.[2] ECF 13, at 9. Keyser states that, from October 21 to November 8, 2023, he was so incapacitated that he could not get the attention of staff to request further treatment. *Id*. at 10. He explains that only after receiving a "GTL tablet" and help from a new cellmate was he able to contact his godmother, who spoke with administrative staff. *Id*.

The record indicates that on November 8, 2023, Keyser was seen by prison medical staff, who decided transfer him to an outside facility for care. On November 8, RN Smith-Patterson evaluated Keyser during an unscheduled nurse visit. ECF 25-4, at 5. Keyser reported problems seeing and stated that he thought he "messed something up with a nerve." *Id*. Both eyes were closed, and he reported that he had sustained an injury to his right eye during an altercation on the unit and was now unable to see. *Id*. at 6. A soft bulging area on his right upper eyelid was observed but no redness or visible injury to the sclera was seen. *Id.* Keyser was referred to a provider. *Id*.

Physician Assistant Bruce Ford evaluated Keyser that same day. ECF 25-4, at 7, 9. Keyser reported he was stabbed by his cellmate on October 20 and had been trying to get medical attention. *Id.* at 7. He reported being struck in the back and face. *Id.* He stated he was legally blind and was to be treated for glaucoma. *Id*. Ford observed that a note from 2009 indicated Keyser had severe

---

[2] Keyser alternately refers to the person contacted as both "mother" and "godmother." *See* ECF 13, at 9–11.

vision loss. *Id*. No soft tissue swelling or bruising was observed. *Id.* Keyser stated that the vision in his left eye was worse, but he refused to open the left eye for an exam because it was too painful. *Id*. Ford sent Keyser to Tidal Health for an emergency evaluation. *Id*.

Dr. Stensland evaluated Keyser in the emergency department. ECF 25-5, at 1. The physician noted that Keyser was 34 years old with a history of asthma and glaucoma and that he presented with the primary complaint of blindness in both eyes since an altercation on October 20, 2023. *Id*. Keyser reported that before the incident, he was legally blind but could see out of his right eye, and after the incident, he could see only light out of his right eye and his left eye was blurry. *Id*. Keyser explained that another inmate was able to contact his mother, who told the facility to send him to the hospital for evaluation. *Id*. He also explained that both eyes were tearing and that he had difficulty opening his right eye because the eyelid spasmed when he tried to open his eye. *Id*. Keyser also stated he had a wound to his right parietal area that had healed. *Id*. A CT scan of Keyser's head and maxillofacial bones showed no acute fracture, hemorrhage, or other traumatic injury. *Id*.

Examination of Keyser's eye showed no fluorescein uptake or evidence of corneal abrasion. *Id*. The pressure was normal in both eyes, extraocular movements were intact, conjunctiva were normal, and the pupils were equal, round, and reactive to light. *Id*. at 3. A Seidel exam, the test to assess for the presence of aqueous humor leakage, was negative. *Id*. The doctor noted that Keyser's baseline eyesight was unclear because Keyser was not consistent in his report of his history. *Id*. at 1. However, the doctor observed that Keyser reported he was born with glaucoma and was legally blind in both eyes. *Id.* The doctor did not see a need for emergency care and recommended outpatient follow-up with an ophthalmologist. *Id.* He prescribed Tylenol and

Motrin as needed for pain. *Id.* Keyser requested a sleep aid and was prescribed Trazodone. *Id*. He was discharged in good condition. *Id.*

On November 10, 2023, Certified Registered Nurse Practitioner Roderer evaluated Keyser during an unscheduled provider visit. ECF 25-4, at 2, 3. Roderer noted she would try to see Keyser for a follow-up the following week. *Id.* at 2. When Roderer evaluated Keyser, Keyser's November 3 Tylenol prescription for pain management was still active. *Id.* at 3.

On November 13, 2023, Keyser claims the Warden had him returned to general population. ECF 13, at 11. Keyser claims he was blind and unstable at the time, and "Unit 5-Admin Seg staff had [Keyser] returned to infirmary." *Id.*

Nurse Johnson saw Keyser on November 14, 2023, for an unscheduled sick call. ECF 25-6, at 36. During the exam, Keyser's vital signs were stable, but he exhibited moderate distress. ECF 25-4, at 1. He complained he was blind in both eyes due to an altercation. *Id.* Johnson spoke with a provider and requested a consultation for ophthalmology. *Id.*

That same day, Keyser was taken to the ECI infirmary where he was seen by PA Campbell. ECF 25-6, at 24, 26. Keyser explained that he had blindness in his left eye since childhood and stated that he had been unable to see from his right eye since the October altercation. *Id.* at 24. It was noted that Keyser did not report the altercation to medical until a couple of weeks after it happened. *Id.* Campbell discussed Keyser's case with the onsite physician who agreed to admit Keyser to the infirmary for evaluation. *Id.* Keyser stated that he had been eating and taking care of his activities of daily living (ADLs). *Id.* Campbell determined that Keyser suffered chronic blindness in one eye, and Campbell wanted to rule out worsening impairment in both eyes. *Id.* at 25. During the evaluation, Keyser squinted his eyes and would not open them, so Campbell was unable to assess his visual acuity. *Id.* at 24. Keyser stated he was unable to see the chart. *Id.*

Campbell continued the prescription for Tylenol, added ibuprofen, and admitted Keyser to the infirmary. *Id.* at 25, 26.

The following day, Dr. Matera saw Keyser in the infirmary. ECF 25-6, at 18–19; *see also* ECF 25-2, at 7–8, ¶¶ 15–16. Keyser complained of vision issues that he had since a fight with a cellmate in October. ECF 25-6, at 18. He had been sent to the emergency room for evaluation and the CT scan of his head was negative. *Id*. There was no obvious global trauma or anterior segment abnormalities, and his vital signs were stable. *Id.* Keyser forced his eyelids closed as Dr. Matera spoke to him but denied light sensitivity. *Id*. Dr. Matera directed Keyser to concentrate on looking down to his feet and was then able to see the right eye well and the left eye to a lesser extent. *Id*. Both eyes were reactive to light, the anterior chambers were clear, and there was no photophobia. *Id*. The tracking of Keyser's eyes appeared normal. *Id.* Dr. Matera placed an order for bedrest/feed-in so that Keyser's meals would be brought to him; Dr. Matera did not need to order a bottom bunk and tier (which he was prepared to order) because they had previously been ordered. ECF 25-6, at 18. Keyser expressed concern about getting his legal papers into the infirmary and wanted "sleeping medicine" that he had been provided in the past. *Id*. Dr. Matera told Keyser that he would need to place a request for an evaluation by behavioral health. *Id*. He explained to Keyser that Trazodone was an antidepressant and that a behavioral health professional needed to evaluate Keyser to determine whether it was safe to prescribe. ECF 25-2, at 8, ¶ 16. When Dr. Matera went to move to another patient's bedside, Keyser looked at Dr. Matera and asked when he would see the "sleeping pill" doctor. ECF 25-2, at 8, ¶ 16. Dr. Matera noted that "[t]he tracking in [Keyser's] eyes was normal during that interaction." *Id*.

In response to Keyser's allegations in this lawsuit that Dr. Matera should have prescribed him Trazodone to help him sleep, Dr. Matera states that the American Addiction Centers describes

Trazodone as "originally designed to be used in the treatment of depression, but due to its sedating effects, it is more often used as a sleep aid in people with depression and to treat anxiety, fibromyalgia, and many other conditions/disorders." ECF 25-2, at 6, ¶ 11. Dr. Matera claims he did not fill the Trazodone prescription because the drug has a high risk for abuse and diversion within the prison setting and creates a security risk. *Id.*

Dr. Matera discharged Keyser to his housing unit pending the optometry and medical follow up. ECF 25-6, at 19. He was prescribed ibuprofen until November 23, 2023. *Id.* His November 3 prescription for Tylenol remained active until November 16, 2023. *Id.* A few hours after the visit, Dr. Matera entered an addendum to his note documenting that, when he evaluated Keyser, Keyser was not in distress and reported no new signs or symptoms other than a long history of being legally blind in the left eye. *Id.* at 18.

Keyser alleges that when he was discharged from the infirmary, he refused general population housing because he was still visually impaired and unstable. ECF 13, at 11. Stigall issued Keyser an infraction for refusing housing, stating, "I don't want a blind man on my watch." *Id.* Keyser alleges that Dr. Matera's decision to discharge him from the infirmary caused him to get the infraction. *Id.*

Dr. Matera states that Keyser was stable when he discharged him from the infirmary and that there was no indication that Keyser could not function in general population. ECF 25-2, at 9, ¶ 17. Keyser did not have photophobia, he was not in distress, and he could track Dr. Matera's movement with his eyes. *Id.* Keyser confirmed he was able to complete his ADLs. *Id.* The

bedrest/feed-in order ensured he would not have to leave his cell to walk to meals. *Id.* Additionally, the emergency room physician had found no need for urgent medical care for his eyes. *Id.*

According to Keyser's Medication Administration Record, Dr. Matera prescribed Tylenol as needed on November 3 through November 16, 2023. ECF 25-2, at 9, ¶ 18. The medication was prescribed "Keep on Person" ("KOP"), meaning that Keyser kept the medication with him and did not need to have the nurse administer it. *Id.* Keyser received 30 tablets of Tylenol on or about November 4, 2023. *Id.* Additionally, PA Campbell prescribed ibuprofen twice daily from November 14 through November 23, 2023. *Id.* This prescription was also KOP, and Keyser was given 20 tablets. *Id.* Keyser alleges that, on November 25, 2023, Johnson refused to provide him with any medication, leaving him in pain from the injuries he sustained during the October attack. ECF 13, at 11. The record shows that Keyser was not prescribed any medication that would require medical staff administration on that date. ECF 25-8, at 2, ¶ 5.

On December 19, 2023, Keyser was seen by an optometrist. ECF 25-4, at 31. Keyser complained of decreased vision and a history of glaucoma. *Id.* On examination, Keyser rolled his eyes up. *Id.* The optometrist requested a referral to an ophthalmologist due to the unexplained decrease in vision. *Id.* at 32. The optometrist noted Keyser needed an optical coherence tomography ("OCT") of the optic nerve. *Id.* That day, Campbell submitted an ophthalmological consultation request, which was approved and scheduled. ECF 25-6, at 3–4; ECF 25-5, at 28–31.

Keyser was seen by an optometrist on February 4, 2024 for complaints of glaucoma and a request for eye drops. ECF 25-4, at 28–29. The optometrist assessed that Keyser had corneal scarring in both eyes and glaucoma. *Id.* at 28. The optometrist recommended a consult with an

ophthalmologist for an OCT scan of the optic nerve and prescribed Latanoprost eyedrops. *Id*. at 28, 30.

On February 6, 2024, Nurse Practitioner Roderer evaluated Keyser, whom custody staff brought to medical after he complained of vision changes. ECF 25-3, at 31. Roderer noted that Keyser had a history of congenital glaucoma/blindness in the left eye and had been in restricted housing. *Id*. It was also noted that he had been seen by optometry recently, but the documentation from that examination was not available. *Id*. Keyser reported that he was prescribed eyeglasses to protect his eyes from light and dust. *Id*. He came to medical in a wheelchair and kept his eyes closed during the visit, complaining that his right eye watered when he opened it. *Id.* He also reported he had been stabbed and received blows to the head during the October altercation, and his pain was not being treated. *Id*. Keyser's consultation with ophthalmology was pending, and the case was discussed with Dr. Matera. *Id*. at 32. NP Roderer and Dr. Matera agreed to have Keyser stay in the infirmary pending his next eye exam. *Id*.

Dr. Matera evaluated Keyser on February 8, 2024, in the ECI infirmary. ECF 25-3, at 13– 14. Keyser reported no worsening of his vision. *Id*. at 13. Dr. Matera advised Keyser that an ophthalmology appointment was set for the following week, and Keyser expressed his satisfaction. *Id*. Keyser was able to walk around his cell and was able to see and recognize Dr. Matera. *Id*. Keyser expressed a desire to return to his cell and indicated he was not sure why he had been sent to the infirmary. *Id*. Dr. Matera prescribed Motrin and discharged Keyser to his housing unit. *Id.* At that time, Keyser also had prescriptions for ibuprofen and Tylenol, which were valid until February 12, 2024. *Id*.

Ophthalmologist Dr. Paul Lagonigro evaluated Keyser on February 15, 2024. ECF 25-4, at 24. Keyser reported that his vision had worsened since his last visit and that his visual acuity in

both eyes was blurry. *Id.* Dr. Lagonigro assessed (1) "unspecified visual loss" in both eyes; (2) eye pain in both eyes; and (3) "nuclear cataract" in the right eye. *Id.* at 26–27. As to Keyser's long-term history of poor vision in his left eye, Dr. Lagonigro noted an apparent congenital/delivery-based endothelial scarring with amblyopia (lazy eye). *Id.* at 26. Keyser's intraocular pressure was normal, and the OCT scan showed a healthy nerve. *Id.* As to the new vision loss in the right eye, the exam showed an atraumatic anterior chamber, no issues with the lens, clear viscus, attached retina, and a pink, healthy nerve. *Id.* The OCT scan also showed that the nerve and macula were normal. *Id.* Dr. Lagonigro did not suspect traumatic optic neuropathy and noted he would alert the facility doctor. *Id.* He also indicated that possible future workups could include an MRI of the brain or a tertiary eye evaluation for neuro/OKN drum testing. *Id.* As for treatment for Keyser's reported eye pain, Dr. Lagonigro noted that, after counseling Keyser, they decided on a treatment plan of continued observation of both eyes. *Id.* at 26–27. Dr. Lagonigro explained to Keyser that cataracts did not require treatment unless they impacted Keyser's ADLs, in which case extraction of the cataract with lens implant insertion should be performed. *Id.* at 27. Dr. Lagonigro concluded that Keyser should return for follow-up as needed. *Id.*

On February 23, 2024, Keyser's godmother sent a letter complaining of Keyser's injuries and lack of medical care. ECF 13, at 11. Administrative Officer Sandra Holmes responded to the letter. *Id.* at 11–12. Holmes stated that the Inmate Grievance Office did not accept third-party complaints and that Keyser had already filed a grievance, which was being processed. *Id.* Keyser alleges he was prevented from complaining "about the assault, abusive treatment, and housing in

segregation unit" because Kestler refused to provide him with an Administrative Remedy Procedure ("ARP") form on November 21, 2023. *Id.* at 11.

On April 10, 2024, Keyser was transferred from ECI to Roxbury Correctional Institution, and Dr. Matera had no further involvement in his care. ECF 25-2, at 12, ¶ 24.

Keyser claims that the Warden, Wroten, Torney, Stigall, Kiser, and Kestler were deliberately indifferent to his safety by failing to protect him from the assault. ECF 13, at 12. Keyser also claims Torney and Kiser were deliberately indifferent to his medical needs by failing to ensure he received medical care after the assault. *Id.* at 8. Keyser further claims that Dr. Matera, King, and Johnson were deliberately indifferent to his medical needs by failing to provide timely medical care and treatment. *Id.* at 12. Additionally, Keyser claims that all defendants violated unspecified Maryland laws and the Maryland Declaration of Rights and breached their duty to provide timely medical care. *Id*. Specifically, Keyser claims that Wroten breached his duty to keep Keyser safe from harm when he failed to make rounds every 30 minutes and that all defendants were negligent in failing to prevent the assault, addressing Keyser's injuries promptly and adequately, and handling his medications. *Id*. As relief, Keyser seeks damages of $20 million from the correctional defendants collectively and $3 million from each of the medical defendants respectively. *Id.* at 5. Keyser also seeks an injunction that orders the defendants to give him ophthalmological care for his vision impairment. *Id.*

Dr. Matera, King, and Johnson filed a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. ECF 25. Keyser opposed the motion. ECF 29. The medical defendants replied. ECF 34. Keyser then filed a surreply, ECF 40, which the medical defendants moved to strike. ECF 41. Keyser opposed the motion to strike. ECF 43. Because no party is entitled to file a surreply without leave of Court, *see* Loc. R. 105.2(a), the medical

defendants' motion to strike Keyser's unauthorized surreply is granted.[3] The Warden, Wroten, Torney, Kiser, Stigall, and Kestler also filed a motion to dismiss or in the alternative for summary judgment, ECF 36, which Keyser opposed. ECF 39.[4] The correctional defendants filed a reply. ECF 42.

## II.    Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that a defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus*

---

[3] Surreplies are "generally disfavored." *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013), *aff'd in part on other grounds*, 778 F.3d 463 (4th Cir. 2015). The court may permit a surreply when a movant raises an issue for the first time in their reply. *See Courtney-Pope v. Bd. of Educ.*, 304 F. Supp. 3d 480, 485 (D. Md. 2018). Because Keyser's proposed surreply does not contest matters presented for the first time in the medical defendants' reply, the surreply is stricken.

[4] In his opposition, Keyser asserts for the first time that he, a visually impaired inmate, is a protected person under the Americans with Disabilities Act and should have been housed in a single cell. ECF 39, at 1–2. In correspondence filed on September 5, 2025, Keyser also asserts an equal protection violation for the first time. ECF 45, at 1. These allegations are not in Keyser's complaint and will not be considered by the Court in deciding the pending motions. *See Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Woodbury v. Victory Van Lines*, 286 F. Supp. 3d 685, 692 (D. Md. 2017) (stating it is axiomatic that a plaintiff may not use their memorandum in opposition to amend the complaint).

*Christ Is the Answer Ministries, Inc. v. Balt. Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the court must accept the allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022). But the court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)). The court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

The court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c). The court also may consider judicially noticed facts and documents integral to and explicitly relied on in the complaint when their authenticity is not disputed. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015); Fed. R. Evid. 201(b).[5]

When the parties present and the court considers matters outside the pleadings on a Rule 12(b)(6) motion, the court must treat the motion as one for summary judgment under Rule 56, and

---

[5] The Court is mindful that Keyser does not have counsel. "[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'" *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Accordingly, the Court must construe pro se pleadings liberally. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020). But "liberal construction does not require [the Court] to attempt to 'discern the unexpressed

"[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Keyser received sufficient notice that the motion may be treated as a summary judgment motion. The Court notified Keyser that he had the right to respond to the defendants' motions, that the motions could be construed as motions for summary judgment, and that if he did not file timely and adequate written responses, the Court could dismiss the case or enter judgment against him without providing him another opportunity to respond. ECF 27, 37. Moreover, the defendants' motions identified summary judgment as possible relief and provided sufficient notice for Keyser to have a reasonable opportunity to present relevant evidence in support of his position. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). The Court is satisfied that Keyser has been advised that the defendants' motions could be treated as motions for summary judgment and that he has been given a reasonable opportunity to present materials in response to the motions. The Court will resolve the motions, in part, under Rule 56.

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party

---

intent of the plaintiff[;]'" the Court need only "determine the actual meaning of the words used in the complaint." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)). Thus, a pro se complaint "still 'must contain enough facts to state a claim for relief that is plausible on its face.'" *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)).

must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Id.* at 251. The Court "should not weigh the evidence." *Perkins*, 936 F.3d at 205. However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is proper. *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

In response to a motion for summary judgment, a party may file a Rule 56(d) affidavit detailing the not-yet-discovered facts that are necessary to defeat summary judgment. *See Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Rule 56(d) motions are "broadly favored and should be liberally granted" to protect non-moving parties from premature summary judgment motions. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013) (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010)). Even so, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in the Rule 56 affidavit must be "essential to . . . [the] opposition." *See* Fed. R. Civ. P. 56(d). A Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact

sufficient to defeat summary judgment." *See Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995).

In his opposition to the medical defendants' motion to dismiss or, in the alternative, for summary judgment, Keyser states that "[m]ore discovery is factually necessary." ECF 29, at 3. The Court will construe this as a request for discovery under Rule 56(d). Keyser states that cameras are present throughout the facility and video evidence would show his physical condition when Wroten escorted him from his cell on October 20, 2023, hours after the assault, and would show which officer later transported him to his "new location." *Id.* at 3–4. Keyser also asserts that video evidence would show which medical staff went to the holding cell to examine him on the date of the assault. *Id.* at 4. Lastly, Keyser asks that the defendants produce the photos taken of him after the assault. *Id.* Yet Keyser does not explain how any of this evidence is necessary for him to oppose summary judgment. Because the additional evidence that Keyser seeks in discovery is either within his personal knowledge or is not necessary to create a genuine dispute of material fact sufficient to defeat summary judgment, Keyser's request for discovery is denied.

## III.    Discussion

Under Section 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*,

443 U.S. 137, 144 n.3 (1979)); *Wahi v. Charleston Area Med. Ctr.*, 562 F.3d 599, 615 (4th Cir. 2009).[6]

A defendant's own action—or failure to act—is required for personal liability under § 1983. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). There is no respondeat superior liability under § 1983. *Love-Lane*, 355 F.3d at 782. An official may be found liable only if the plaintiff shows the official "acted personally in the deprivation of the plaintiff['s] rights." *Vinnedge*, 550 F.2d at 928 (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md.), *aff'd*, 451 F.2d 1011 (4th Cir. 1971)).

Officials may be held liable under § 1983 for the conduct of their subordinates. To state a claim for supervisor liability under § 1983 based on a subordinate's conduct, the plaintiff must allege that (1) "the supervisor had actual or constructive knowledge" that the subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury. *Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Keyser asserts two constitutional violations: a failure to protect from harm and a failure to provide medical care. Specifically, Keyser alleges that the Warden, Wroten, Torney, Stigall, Kiser, and Kestler failed to protect him from the assault by Epps and that Torney and Kiser failed to

---

[6] Insofar as Keyser alleges the defendants violated the Maryland Declaration of Rights and DPSCS rules, regulations, policies, procedures or directives, *see* ECF 13, at 12, these are not constitutional provisions or federal laws. Therefore, these alleged violations cannot form the basis for § 1983 liability unless they also amount to violations of constitutional rights.

ensure he received medical care after the assault. Keyser also alleges that after the assault, Dr. Matera, King, and Johnson were deliberately indifferent to his medical needs by failing to provide medical care and treatment.

### A. Failure to Protect

Keyser alleges that several of the correctional defendants—Wroten, Stigall, Kestler, Torney, Kiser, and the Warden—failed to protect him from the assault by his cellmate in violation of the Eighth Amendment.

"The Eighth Amendment protects prisoners from 'unnecessary and wanton infliction of pain.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of . . . inmates." *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319–20 (1986)). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

"Prison officials violate the Eighth Amendment's cruel-and-unusual-punishment clause when they are deliberately indifferent to a substantial risk to an inmate's safety . . . ." *King v. Riley*, 76 F.4th 259, 264 (4th Cir. 2023). To prevail on a failure-to-protect claim, the prisoner must establish an objective and a subjective element. *Id.* First, he must show an objectively "substantial risk of serious harm." *Id.* (quoting *Farmer*, 511 U.S. at 834); *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). Second, the prisoner must show that the defendant "subjectively recognized a substantial risk of harm" and "subjectively recognized that his actions were inappropriate in light of that risk." *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (quoting *Parrish*, 372 F.3d at 303) (emphasis in *Anderson* removed). The objective inquiry

requires the court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). "[N]ot every injury suffered by a prisoner at the hands of another 'translates into constitutional liability for prison officials responsible for the victim's safety.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 834). A prison official who knew of a risk and "'responded reasonably to the risk' cannot be found liable under the Eighth Amendment." *King*, 76 F.4th at 264 (quoting *Farmer*, 511 U.S. at 844).

The subjective inquiry requires a showing of deliberate indifference, which is "a very high standard" that requires more than "a showing of mere negligence." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999); *see also Danser v. Strawberry*, 772 F.3d 340, 347 (4th Cir. 2014) (same). The Supreme Court has delineated the difference between tort liability and liability for a constitutional violation:

> The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. *See Prosser and Keeton* §§ 2, 34, pp. 6, 213–214; *see also* Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680; *United States v. Muniz*, 374 U.S. 150 (1963). But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837–38.

Keyser has not adequately alleged a failure to protect claim against the Warden, Kestler, Torney, Kiser, or Stigall. Keyser alleges his cellmate, Antonio Epps, assaulted him on October 20, 2023. Yet Keyser does not allege that the Warden, Kestler, Torney, Kiser, or Stigall knew that Epps posed a threat to him before the assault occurred. The only specific allegations about the

Warden are that on November 13, 2023, he failed to protect Keyser when he released him to general population "blind and unstable" and unit staff returned him to the infirmary. ECF 13, at 11. That alleged conduct occurred three weeks *after* the alleged assault. And the only specific allegations about Stigall and Kestler are that Stigall issued Keyser a rule infraction on November 15, 2023, for refusing housing and that Kestler refused to provide him an ARP form on November 21, 2023. *Id.* Again, that alleged conduct occurred long after the alleged assault. Finally, the only specific allegations about Torney and Kiser are that they "failed to ensure Keyser received adequate treatment for his injuries" after the assault. ECF 13, at 8. Keyser's complaint includes no allegations that Torney and Kiser failed to protect him from the assault. Even when Keyser's allegations are reviewed in the light most favorable to him, none of the alleged misconduct by these correctional defendants remotely suggests they failed to protect Keyser from the attack by Epps. Because Keyser has not plausibly alleged that the Warden, Kestler, Torney, Kiser, or Stigall knew Epps posed a risk of harm to Keyser or that they failed to protect Keyser from harm, Keyser's failure to protect claim against them is dismissed for failure to state a claim.

As for Wroten, Keyser has stated a failure to protect claim against him, but Wroten is entitled to summary judgment on the claim.

Keyser alleges that, on the night of the assault, Wroten failed to make rounds on his housing tier from 11 p.m. until between 2 a.m. and 3 a.m., even though DPSCS policy required him to make rounds every 30 minutes. Keyser alleges that, had Wroten made those rounds, Keyser would not have been assaulted. Keyser's allegations are not supported by any evidence in the record.

The undisputed record evidence shows that, on the night of October 19, 2023 and the early morning of October 20, 2023, security rounds were conducted "approximately every thirty minutes." ECF 36-3, at 2; *see also id.* at 3 (noting status of unit at 11:00 p.m. and 11:35 p.m. on

October 19 and at 12:03 a.m., 12:30 a.m., 12:55 a.m., 1:10 a.m., 1:34 a.m., and 2:30 a.m. on October 20). And even if Wroten had waited more than 30 minutes in between rounds, in violation of DPSCS policy, that would amount only to negligent conduct, not deliberate indifference to Keyser's safety. *See Grayson*, 195 F.3d at 695–96 (holding a showing of mere negligence is insufficient to meet the high standard of a deliberate indifference claim under the Eighth Amendment).

Further, there is no record evidence that Wroten knew about a substantial risk of harm to Keyser on the night Keyser was assaulted. Keyser does not allege, much less demonstrate, that Wroten or any other correctional staff knew that Epps posed a risk of harm to Keyser's safety. In fact, the record demonstrates that Keyser and Epps were in a cell together for weeks prior to the altercation and that a mere four days before the altercation Keyser had an opportunity to move from the cell with Epps to general population but refused to do so. ECF 36-3, at 6, 11; ECF 13, at 10. After the altercation, when Keyser advised Wroten that he did not want to return to his cell with Epps, Wroten immediately contacted his supervisor, had Keyser evaluated by medical staff, and assigned to another cell. ECF 36-3, at 7; ECF 13, at 8. Based on this evidence, no reasonable juror could find that Wroten knew about and ignored the risk that Epps would attack Keyser in their cell. On the contrary, the record evidence indicates that Wroten responded immediately to the safety concern that Keyser raised and had him assigned to another cell. Because Keyser has

not submitted any evidence that Wroten was deliberately indifferent to a substantial risk of harm to him, Wroten is entitled to summary judgment on the failure to protect claim.

### B.  Failure to Provide Medical Care

Keyser asserts failure to provide medical care claims against correctional defendants Kiser and Torney and the medical defendants.

Under the Eighth Amendment, the government must "provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. To prevail on a failure to provide medical care claim, a plaintiff must establish that the defendants' actions or their failure to act amounted to "deliberate indifference to serious medical needs." *Id.* at 106; *see also Anderson*, 877 F.3d at 543. The deliberate indifference standard consists of a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97–98 (quoting *Farmer*, 511 U.S. at 834, 837–38).

Deliberate indifference to a serious medical need requires proof that, objectively, the incarcerated plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure it was available. *See Farmer*, 511 U.S. at 834–37; *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d

at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After establishing a serious medical need, the plaintiff must establish that the defendants were subjectively reckless in treating or failing to treat the medical condition. *See Farmer*, 511 U.S. at 839–40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish*, 372 F.3d at 303) (emphasis in *Anderson* removed); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Makdessi*, 789 F.3d at 133).

### 1. Torney and Kiser

Keyser claims that Torney and Kiser, shift supervisors, failed to ensure that he received adequate medical treatment after Epps assaulted him. Though Keyser alleges that they "failed to ensure Keyser received adequate treatment for his injuries," ECF 13, at 8, this conclusory allegation is not supported by any specific facts. Keyser has not alleged that Torney or Kiser

observed the assault, observed his injuries immediately after the assault, or knew that he had been injured. Keyser has not alleged their personal involvement in the constitutional violation. It appears that Keyser names them as defendants simply because of their roles as shift supervisor and commander, but he does not allege that they are subject to supervisor liability. Keyser has not alleged that any of their subordinates failed to ensure Keyser received medical care after the assault, that they were aware of a subordinate's conduct that "posed a pervasive and unreasonable risk of constitutional injury," and that they failed to respond adequately. *See Timpson*, 31 F.4th at 257. Accordingly, Keyser's failure to provide medical care claims against Torney and Kiser are dismissed.

### 2. The Medical Defendants

Keyser alleges that the medical defendants failed to provide him with adequate medical care after he was assaulted. For this alleged constitutional violation, Keyser seeks $9 million total in damages from the medical defendants. Because a § 1983 plaintiff is only entitled to damages for claims against state actors in their individual (not official) capacities, the Court construes Keyser's failure to provide medical care claims against Dr. Matera, King, and Johnson as claims against them in their individual capacities. *See Hafer v. Melo*, 502 U.S. 21, 27 (1991). The medical defendants are entitled to summary judgment on these claims.[7]

The Court starts with the claim against Dr. Matera. To prevail on a failure to provide medical care claim, Keyser must show that he was suffering from a serious medical need and that

---

[7] In addition to damages, Keyser also seeks prospective injunctive relief: ophthalmological care for his vision impairment. *See* ECF 13, at 5. The Court construes this request for prospective injunctive relief as a claim against the medical defendants in their official capacities. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). Though prospective injunctive relief against a state actor in their official capacity is not barred by Eleventh Amendment immunity, *see Lee-Thomas v. Prince George's Cnty. Pub. Schs.*, 666 F.3d 244, 249 (4th Cir. 2012), Keyser's claim for injunctive relief fails for two reasons. First, Keyser has not alleged that an

Dr. Matera was aware of Keyser's need for medical care and failed to provide it. *See Farmer*, 511 U.S. at 834–37. Keyser alleges that Dr. Matera was deliberately indifferent to his medical needs because Dr. Matera failed to fill a prescription for Trazodone and because Dr. Matera released Keyser from the infirmary to the general population too soon. Neither claim is supported by the record.

First, Keyser alleges Dr. Matera refused to fill his prescription for Trazodone, a sleep aid an ER doctor prescribed him after he asked for medication to help him sleep. Though Keyser does not allege that he sought Trazodone because of difficulty sleeping related to his eye condition, the Court makes that reasonable inference, and the record supports it. Thus, Keyser has submitted evidence that he had a serious medical need.

But Keyser has not submitted evidence that Dr. Matera was deliberately indifferent to his medical need. Keyser alleges in his complaint that Dr. Matera refused to fill the Trazodone prescription because it was "too strong." ECF 13, at 9. For his part, Dr. Matera has submitted a sworn declaration in which he explains that the reason he did not fill the Trazodone prescription was because Trazodone's sedative effects raise safety concerns in a prison setting. ECF 25-2, at 6, ¶ 11. And the medical records show that Dr. Matera referred Keyser to behavioral health staff to determine whether he should be prescribed Trazodone. ECF 25-6, at 18. Keyser has not submitted any evidence in response. The only evidence in the record shows that Dr. Matera considered the risks and benefits of Trazodone for Keyser, declined to prescribe it, and referred him to a

---

unconstitutional policy or custom caused his injury—a prerequisite for any official capacity claim. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (a plaintiff suing a defendant in their official capacity must allege that "the entity's 'policy or custom' . . . played a part in the violation of federal law" (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978))). Second, for the reasons stated in this memorandum opinion, Keyser has not alleged or shown a violation of his constitutional right to medical care.

behavioral health provider who could evaluate whether Keyser should be prescribed Trazodone for sleep. Thus, Keyser has not raised a genuine dispute of material fact that Dr. Matera was deliberately indifferent to his serious medical needs. The only dispute here, if there is one, is a disagreement between Keyser and Dr. Matera about whether Dr. Matera should have prescribed him Trazodone. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). Keyser has not alleged or submitted evidence of exceptional circumstances.

Second, Keyser claims that Dr. Matera was deliberately indifferent to his medical needs when he prematurely discharged Keyser from the infirmary. According to Keyser, he was still visually impaired and unstable when Dr. Matera discharged him from the infirmary. Because of his instability and visual impairment, Keyser refused housing in general population, and because of his refusal, Keyser was given an infraction. Keyser apparently blames Dr. Matera for the infraction.

Keyser's claims are belied entirely by the record. The record evidence shows that before Dr. Matera discharged Keyser from the infirmary on November 15, 2023, Dr. Matera evaluated him and determined he was stable. In preparation for Keyser's return to general population, Dr. Matera confirmed that Keyser already had orders for bottom bunk and bottom tier and that Keyser was able to feed himself and execute his ADLs. Dr. Matera entered an additional order for bedrest/feed in status to ensure that Keyser did not need to leave his cell to obtain food while he awaited further medical evaluation. Keyser may disagree with Dr. Matera's decision to discharge him from the infirmary, but he has not provided any evidence that he was not fit to be discharged, that he expressed a concern to Dr. Matera about returning to general population, or that Dr. Matera

knew Keyser was medically unfit to be discharged but discharged him anyway. Keyser's allegations, even when read favorably to him, amount to a disagreement with Dr. Matera's decision to discharge him from the infirmary. That is essentially a disagreement over whether Dr. Matera provided Keyser proper medical care. "[S]uch disagreements . . . fall short of showing deliberate indifference." *Jackson,* 775 F.3d at 178. Because Keyser has not submitted any evidence that Dr. Matera was deliberately indifferent to his serious medical needs, Dr. Matera is entitled to summary judgment on the failure to provide adequate medical care claim.

The Court next considers Keyser's claim against RN King. Keyser claims that King treated him immediately after the assault and was deliberately indifferent to his serious medical needs because King failed to examine his eye or bandage his wound and merely provided him with Tylenol for pain. The Court will assume, without deciding, that Keyser can establish a serious medical need: treatment for his eye after the assault. With that assumption, the Court considers whether Keyser has offered any evidence that King was aware of this serious medical need and disregarded it. He has not. There is no evidence in the medical records (or elsewhere) that King saw or treated Keyser after the altercation on October 20. The only reference to King in the record indicates that on October 30, King triaged a sick call from Keyser. ECF 25-2, at 2–3, ¶ 5. There is no evidence that King treated Keyser after the assault on October 20. Thus, Keyser has failed to show that King was subjectively aware of his serious medical need and disregarded it. King is entitled to summary judgment on Keyser's failure to provide adequate medical care claim.

Finally, the Court considers Keyser's claim against RN Johnson. Keyser asserts that Johnson was deliberately indifferent to his serious medical needs because she refused to give him medication on November 25, 2023. This claim, too, is entirely belied by the record. On November 3, 2023, Dr. Matera prescribed Keyser Tylenol as needed every eight hours. The prescription was

valid through November 16, 2023 and was provided KOP, meaning Keyser kept the medication with him and self-administered it. On November 14, 2023, PA Campbell prescribed ibuprofen twice daily. The ibuprofen prescription also was provided KOP and was valid through November 23, 2023. Keyser was given 30 tablets of Tylenol on November 4 and 20 tablets of ibuprofen on a date not identified in the record. As of November 25, 2023, Keyser's prescriptions for Tylenol and ibuprofen had expired, and he had no active prescriptions that required medical staff to give him any medication. Contrary to Keyser's allegations, the evidence shows that Johnson was not able to give him any medication on November 25, 2023. There is no evidence that Johnson was deliberately indifferent to Keyser's serious medical needs. Keyser's allegations are not supported by any evidence, and they are "blatantly contradicted by the record." *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Because "no reasonable jury could believe" Keyser's account, the Court will "not adopt [his] version of the facts for purposes of ruling on [the] motion for summary judgment." *See id.* Keyser has not established a genuine dispute of material fact that Johnson provided him inadequate medical care. As such, Johnson is entitled to summary judgment on this claim. *See, e.g.*, *Hixson v. Moran*, 1 F.4th 297, 303 (4th Cir. 2021) (affirming grant of summary judgment on prisoner's inadequate medical care claim).[8]

### C. State Law Claims

Under 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction over a claim . . . [where] the district court has dismissed all claims over which it has original jurisdiction." Whether to exercise supplemental jurisdiction is within the court's discretion. *See Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617–18 (4th Cir. 2001). In the

---

[8] Because the defendants prevail on their motions, the Court will not address their additional arguments and defenses.

exercise of this discretion, courts focus on "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7.

This is the "usual case." *Id.* The Court has dismissed or granted summary judgment to the defendants on Keyser's § 1983 claims over which it has original jurisdiction. The only remaining claims are state law negligence claims and an alleged violation of the Maryland Declaration of Rights. Because the remaining claims sound in state law alone, a state court is better suited to hear them. Exercising supplemental jurisdiction would undermine, rather than promote, judicial economy, comity, and fairness to the parties. The Court thus declines to exercise supplemental jurisdiction over Keyser's state law claims. The Court dismisses Keyser's state law negligence claims and claims for violation of the Maryland Declaration of Rights without prejudice.

## IV.    Conclusion

The defendants' motions, treated in part as motions to dismiss and in part as motions for summary judgment, are granted. Keyser's failure to protect claims against the Warden, Stigall, Torney, Kiser, and Kestler are dismissed without prejudice. Summary judgment is granted in favor of Wroten on the failure to protect claim. Keyser's claims that Torney and Kiser failed to ensure that he received adequate medical treatment are dismissed without prejudice. Summary judgment

is granted in favor of all medical defendants on the failure to provide medical care claims. Keyser's state law claims are dismissed without prejudice. A separate Order follows.


September 30, 2025
Date

_____
Deborah L. Boardman
United States District Judge